UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ERNESTO VARGAS,<br><br>          Plaintiff,<br><br>   v.<br><br>L. LOPEZ, et al.,<br><br>         Defendants. | Case No. 23-cv-02490-TSH<br><br>**ORDER DENYING MOTION FOR SUMMARY JUDGMENT**<br><br>Re: Dkt. No. 46 |

## I.    INTRODUCTION

Plaintiff Ernesto Vargas, a state prisoner, brings this civil rights action pursuant to 42 U.S.C. § 1983 against Defendants Correctional Officer L. Lopez-Ortega and Correctional Lieutenant C. Whitman.  Vargas alleges Officer Lopez-Ortega forced him into the prison recreation yard, despite knowing he would be attacked by a group of gang-affiliated prisoners.  Vargas alleges he was immediately attacked by other inmates, yet Lieutenant Whitman tried to absolve prison staff of any liability by finding him guilty of participating in a riot.  Vargas asserts an Eighth Amendment failure-to-protect claim and a state-law negligence claim against Officer Lopez-Ortega.  He asserts a First Amendment retaliation claim against Lieutenant Whitman.

Pending before the Court is Defendants' Motion for Summary Judgment.  ECF No. 46. Vargas filed an Opposition (ECF No. 53) and Defendants filed a Reply (ECF No. 55).  The Court finds this motion suitable for disposition without oral argument and **VACATES** the March 20, 2025 hearing.  *See* Civ. L.R. 7-1(b).  For the reasons stated below, the Court **DENIES** the motion.[1]

---
[1] The parties consent to magistrate judge jurisdiction pursuant to 28 U.S.C. § 636(c).  ECF Nos. 6, 12.

## II.    BACKGROUND

Vargas is an inmate with the California Department of Corrections and Rehabilitation ("CDCR").  Jt. Stmnt. of Undisputed Facts ¶ 1, ECF No. 45.  He is currently incarcerated at the Correctional Training Facility ("CTF"), where he was also housed in May and June 2021.  *Id.* ¶ 2.  In May 2021 Officer Lopez-Ortega was working as a floor officer assigned to E-Wing, which was Vargas's assigned housing unit at the time.  Lopez-Ortega Decl. ¶ 2, ECF No. 46-6.  In May and June 2021 Lieutenant Whitman was working as a program lieutenant at CTF.  Whitman Decl. ¶ 2, ECF No. 46-4.  Officer Whitman has worked as an officer with CDCR since approximately 2007.  Gallagher Decl. ¶ 4, Ex. 6 (Whitman Dep.) at 10:14-16, ECF No. 53-9.

### A.    Security Threat Groups

In California's prisons, inmate groups commonly referred to as prison gangs are identified as Security Threat Groups ("STGs").  Cal. Code Regs. tit. 15, § 3000.[2]  Because STGs "jeopardize public safety, as they promote violence, drug trafficking, extortion, and create substantial risks in prisons, jails and local communities," STG management within prisons "requires a comprehensive management strategy that includes prevention, interdiction and rehabilitation.  It is the policy of the [CDCR] to ensure that its employees and incarcerated persons are able to work and live without threat of intimidation, injury, and/or death."  *Id.* § 3023(a).

STGs present at CTF included the Bulldogs and Sureños.  Lopez-Ortega Decl. ¶ 2.  Before May 2024, certain inmates at CTF who were documented as being affiliated with the Sureños were to be kept separate from certain inmates who were documented as being affiliated with the Bulldogs.  Jt. Stmnt. ¶ 6.  CTF's modified program separated the two groups because inmates affiliated with the Sureños and Bulldogs had a recent history of violence when they programmed together.  Lopez-Ortega Decl. ¶ 2; Galvan Decl. ¶ 3 & Ex. A, ECF No. 46-5.  Close to ten riots broke out between the Bulldogs and Sureños at CTF since 2007.  Whitman Dep. at 68:15-20.

---

[2] "Security Threat Group (STG) means any ongoing formal or informal organization, association, or group of three or more persons which has a common name or identifying sign or symbol whose members and/or associates, individually or collectively, engage or have engaged, on behalf of that organization, association or group, in two or more acts which include, planning, organizing, threatening, financing, soliciting or committing unlawful acts, or acts of misconduct."  Cal. Code Regs. tit. 15, § 3000

1  Bulldogs did not live in the E-Wing with members of the Sureños gangs because they "couldn't

2  program." Instead, Bulldogs lived in the Z-Wing of the CTF. Gallagher Decl. ¶ 9, Ex. 8 (Lopez-

3  Ortega Dep.) at 33:23-34:12, ECF No. 53-11. Officer Lopez-Ortega testified that Bulldogs could

4  not program with other inmates because "[e]very time the Bulldogs would come out, they would

5  just fight. If they were not Bulldogs, they would fight with other people." *Id.* at 36:18-37:1.

6  Because Sureños and Bulldogs fought each other, the CTF also utilized a yard rotation schedule

7  "where certain buildings were going to go out to the recreation yard and not be with the other

8  faction." Whitman Dep. at 68:2-8. To ensure this separation, correctional officers were instructed

9  to review a list of affected inmates before releasing any inmate to the yard. Lopez Dep. at 47:17-

10  48:22.

11      The CDCR classified Vargas an affiliate of the Sureños on October 19, 2018. Gallagher

12  Decl. ¶ 11, Ex. 10 (DEFS 1), ECF No. 53-13. In January 2020 Vargas participated in an interview

13  with his correctional counselor where they discussed Vargas's ability to program with Bulldogs-

14  affiliated inmates. Georgely Decl., Ex. A (Vargas Dep.) at 49:15-50:7, ECF No. 46-3. Inmates

15  were required to participate in the interview to determine if CTF could cease its modified program

16  and return to normal programming. Galvan Decl., Ex. A; Vargas Dep. at 50:2-16; Gallagher Decl.

17  ¶ 4, Ex. 3 (DEFS 81-82), ECF No. 53-6. During his interview, Vargas testified that he could

18  safely program with Bulldogs. Vargas Depo. at 50:14-16. The form used during Vargas's

19  January 2020 interview expressly stated that if Vargas could safely program "without violence on

20  a Level II yard with inmates from all races/ethnics, or present security group affiliations," that

21  Vargas would "be expected to program with Bulldogs." Galvan Decl., Ex. A. Although "Yes" is

22  written next to this statement, only the interviewer signed the form, and there is a handwritten note

23  that Vargas "Refused to sign." *Id.*

24      On October 20, 2020, a CDCR investigation found "sufficient evidence" to identify Vargas

25  as an associate of the Mexican Mafia (EME) gang. Gallagher Decl. ¶ 2, Ex. 1 (VAR00013), ECF

26  No. 53-4. On April 20, 2021, Vargas's request for Temporary Community Leave to attend his

27  mother's funeral was denied, at least in part because he had a suspected affiliation with STG 1

28  Sureños and STG 2 EME. Gallagher Decl. ¶ 12, Ex. 11 (DEFS 64), ECF No. 53-14.

**B.     May 25, 2021 Incident**

Officer Lopez-Ortega states he understood that, per CTF's modified program, in May 2021, certain inmates affiliated with the Sureños, including some other STGs, were placed in one programming group, and certain inmates affiliated with the Bulldogs were placed in a different programming group.  Lopez-Ortega Decl. ¶ 2.  He understood that interactions between certain inmates who were documented as being affiliated with the Sureños and certain inmates who were documented as being affiliated with the Bulldogs were restricted, including restrictions prohibiting certain affiliates of the two STGs from programming together on the yard.  *Id.*  Officer Lopez-Ortega's job as a floor officer required him to know whether an inmate is a validated gang member, and Officer Lopez received training on how to verify whether an inmate was a validated gang member.  Lopez Dep. at 28:2-10.  Officer Lopez-Ortega testified that Vargas was not STG.  Lopez Dep. at 52:23-53:5.

In his declaration, Officer Lopez-Ortega states that at the beginning of his shifts, his supervisors regularly provided him an updated list of the certain inmates in the Sureños group and the Bulldogs group that were not permitted to program together.  Lopez-Ortega Decl. ¶ 3.  However, in his deposition, when asked if he would "receive [a list] daily or was it something that you had on hand," Lopez testified "we had on hand."  When asked if he knew "how often the list was updated," Lopez testified "No."  Lopez Dep. at 48:15-19.  Officer Lopez-Ortega states he was instructed that, because Bulldogs were only housed in Z-Wing, if Z-Wing was scheduled to attend yard at the same time as E-Wing, he was not to release to yard any inmate identified in the Sureños group of the list.  Lopez-Ortega Decl. ¶ 3.  If an inmate in E-Wing was not identified on the list of inmates, Officer Lopez-Ortega understood that there was nothing unique to that inmate to indicate that he could not safely attend yard with all general population inmates, which included inmates on the Bulldogs list.  *Id.*  However, Vargas states he told Officer Lopez-Ortega that he could not safely program with the Bulldogs.  Vargas Decl. ¶¶ 4-5, ECF No. 54.

On the morning of May 25, 2021, Officer Lopez-Ortega was working as an E-Wing floor officer.  Lopez-Ortega Decl. ¶ 5.  Officer Lopez-Ortega began the process of releasing inmates from their cells to attend yard.  *Id.*  To begin this process, Officer Lopez-Ortega instructed all

1    inmates to return to their cells. *Id.* When inmates returned to their cells, Officer Lopez-Ortega

2    and another E-Wing floor officer began releasing inmates, cell by cell, to E-Wing's dayroom. *Id.*

3    Officer Lopez-Ortega states that inmates indicated they wanted to attend yard by placing their

4    identification cards in their cell window. *Id.* Officer Lopez-Ortega and the other floor officer

5    walked up to each cell with an identification card in the window, confirmed the inmate requesting

6    to attend yard was not on the list of inmates who were not permitted to attend yard with Bulldogs,

7    and released the inmate from his cell to the dayroom. *Id.* Vargas disputes this system existed,

8    noting that Officer Lopez-Ortega testified he would go door by door, confirm who lives in each

9    cell, and let them out if they were validated not STG or have them stay inside the cell if they were

10   labeled as STG. Lopez-Ortega Dep. at 49:23-50:23. Even if this system existed, Vargas states he

11   could not have participated, as he was already seated at a table in the E-Wing day room when

12   Officer Lopez-Ortega approached him and instructed him to attend "mandatory" yard. Vargas

13   Decl. ¶ 2. From the E-Wing dayroom, the inmate was to be released to the yard once another

14   prison official released the inmates. Lopez-Ortega Decl. ¶ 5. If an inmate wanted to attend yard

15   but was on the list of inmates who were not permitted to attend yard with Bulldogs, Officer

16   Lopez-Ortega informed the inmate that he could not attend yard. *Id.*

17        During this unlock process, Vargas did not return to his cell because he was already in the

18   dayroom performing duties associated with his work assignment. Lopez-Ortega Decl. ¶ 6. Officer

19   Lopez-Ortega states that, even though Vargas did not need to return to his cell, he confirmed

20   Vargas was not on the list of inmates who were not permitted to attend yard with Bulldogs. *Id.*

21   Vargas disputes this, stating he told Officer Lopez-Ortega he could not safely program with the

22   Bulldogs. Vargas Decl. ¶¶ 4-5.

23        Officer Lopez-Ortega states that Vargas requested to attend yard and, since he was not on

24   the list of inmates who could not be released to yard with Bulldogs, he permitted Vargas to attend

25   yard. Lopez-Ortega Decl. ¶ 5. Officer Lopez-Ortega also states he was in the process of going

26   cell to cell to release inmates to the yard when Vargas approached and told him to let everyone out

27   to the yard. Lopez-Ortega Decl. ¶ 7. Officer Lopez-Ortega states he interpreted Vargas's request

28   to mean Vargas wanted him to release all inmates to yard, including those identified on the list of

5

United States District Court
Northern District of California

1  inmates who were not permitted to attend yard with Bulldogs.  *Id.*  Vargas disputes this, stating he

2  did not tell Officer Lopez-Ortega to let him and everyone else attend yard and, to the contrary,

3  Officer Lopez-Ortega told the E-Wing inmates that there was a mandatory yard, told Vargas

4  specifically it was "go time," that the Bulldogs were waiting for him and he should "go handle

5  [his] business," and that it was "mandatory yard and the gurneys are waiting for you."  Vargas

6  Decl. ¶¶ 2-6; Vargas Dep. at 20:18-21:8; Gallagher Decl. ¶ 13, Ex. 12 (Dicey Dep.) at 41:6-15,

7  42:19-43:2, ECF No. 53-15.  Vargas states he informed Officer Lopez-Ortega he could not

8  program with the Bulldogs because he was a suspected member of two gangs: the EME and

9  Sureños.  Vargas Decl. ¶ 4.

10        While Officer Lopez-Ortega was still going cell to cell to release inmates to yard, another

11  correctional official released the inmates who had been released to the E-Wing dayroom to the

12  yard.  Lopez-Ortega Decl. ¶ 8.  On May 21, 2025, Vargas estimates there were between 60 and 70

13  Bulldogs already in the yard when E-Wing inmates were released to the yard, and he testified they

14  were all yelling and barking.  Vargas Dep. at 21:16-23.

15        Vargas walked out of E-Wing alongside his E- Wing peers, entered the main corridor, and

16  turned left to immediately exit outside from the corridor.  Lopez-Ortega Decl. ¶ 8; Vargas Dep. at

17  21:24-22:1.  When Vargas and his E-Wing peers entered, at least two non-party correctional

18  officers were in the yard.  Vargas Dep. at 22:9-10.  Vargas testified that when he stepped out and

19  was walking towards the yard, he saw "numerous inmates around the handle court, around the

20  phones, like on line, with the -- like, making a line, barking."  *Id*. at 21:17-21.  Vargas and his E-

21  Wing peers walked down the corridor to the gate of the yard, when another officer, Sergeant

22  Glaze, opened the door and led them to the yard.  *Id.* at 21:24-22:1.  Vargas testified that "[a]s

23  soon as we stepped our foot in the yard, all 60 to 70 inmates came towards us running.  There was

24  nowhere to go.  Nowhere to go.  There's only me and like 20 more inmates who was Whites --

25  like three Whites or four Whites, couple Paisas, and couple Southerners.  There was like 15 of us."

26  *Id*. at 22:2-7.  Vargas testified there was nowhere to go "because they closed the gate," and,

27  although at least two other officers were on the yard at the time, "[t]hey couldn't do nothing."  *Id*.

28  at 22:8-10.  Vargas testified he was "getting hit left and right.  They grab me, throw me to the

United States District Court
Northern District of California

1  ground, start kicking me in my head, torso, face, and at that point I was just praying, talking to my

2  mom, that just barely passed away, mom, please just let me leave, let me leave." *Id*. at 22:11-15.

3  Vargas states he saw someone coming toward him like he was going to kick him, at which point

4  he moved his face and got knocked out by a hit toward his neck and shoulder. *Id.* at 22:20-23:1.

5  After he was knocked out, an officer put Vargas in handcuffs. *Id.* at 23:2-7.  Vargas testified he

6  was "sitting in the middle of the yard, bleeding, I didn't know what the hell was happening right

7  now." *Id.* at 23:8-10.  At least one inmate testified he could see the Bulldogs' assault of Vargas.

8  Dicey Dep. at 49:18-23 ("Q: When did you see Vargas again after he disappeared?  A: Getting the

9  shit beat out of him in the yard.").

10     The medical report prepared after the May 25 riot stated that Vargas had abrasions and

11  scratches to both knees and the knuckles on his right hand, had dried blood on his nose, eye area,

12  and right knee, cuts to his right eyebrow and nose area, and reddened area to the back of the head.

13  Jt. Stmnt. ¶ 7.  Vargas required hospitalization to treat bruises to his head; abrasions near his left

14  temple; lacerations to his right eyebrow, nasal bridge, lower lip, and right knee; a dislocated

15  shoulder; and multiple fractures to his nose, which later required surgery.  Vargas Decl. ¶ 11;

16  Gallagher Decl. ¶ 16, Ex. 15 (DEFS 6-7; DEFS 1741-2), ECF No. 53-18.  Vargas testified he still

17  suffers from psychological injuries, including what he believes is anxiety and PTSD.  Gallagher

18  Decl. ¶ 6, Ex. 5 (Vargas Dep.) at 9:18-23; 26:16-27:11, ECF No. 53-8.

19     Defendants contend the large size of the yard, including the location where the riot

20  occurred, provided space for inmates located in the area where the riot occurred to retreat away

21  from the riot location.  Whitman Decl. ¶ 7.  Sergeant Glaze testified that "[t]he best thing, the

22  safest thing for everybody is just to stop their fighting and to assume a prone position if they are

23  involved or to take a seat, because the entire yard, whenever there is an incident, everybody is

24  expected to take a seat."  Gallagher Decl. ¶ 15, Ex. 14 (Glaze Dep.) at 95:4-9, ECF No. 53-17.

25  Vargas disputes this, stating he was unable to retreat because he was essentially stuck between the

26  Bulldogs on one side and the gate to the pedestrian walkway from which he had come on the other

27  side, which another officer, Officer Glaze, had shut and refused to reopen to allow inmates to

28  safely retreat.  Vargas Decl. ¶ 9-11; Glaze Dep. at 96:22-97:18.

1    After prison officials quelled the riot, a non-party officer placed Vargas in handcuffs.

2    Vargas Dep. at 23:2-3.  Officer Lopez-Ortega states he had no prior knowledge that the riot would

3    occur, nor did he believe that permitting Vargas to go to yard would place Vargas in danger.

4    Lopez-Ortega Decl. ¶¶ 8-9.  Vargas disputes this, stating Officer Lopez-Ortega told him the

5    Bulldogs were waiting for him, that Officer Lopez-Ortega was aware that Bulldogs initiated

6    violence with frequency within the CTF, and that Officer Lopez-Ortega also knew that E-Wing

7    and Z-Wing inmates were to be kept separate because there was a potential for inmates from the

8    two wings to fight.  Vargas Decl. ¶¶ 3, 5; Vargas Dep. at 20:21-21:8; Lopez-Ortega Dep. at 36:18-

9    37:1; 46:11-15; Dicey Dep. at 41:6-15.

10   **C.    Rules Violation Report and Appeal**

11   On June 7, 2021, Sergeant Glaze issued Vargas a rules violation report ("RVR") charging

12   him with violating California Code of Regulations title 15, section 3005(d)(3).  Whitman Decl. ¶ 5

13   & Ex. A.  Vargas appealed the report through internal channels.  Gallagher Decl. ¶ 18, Ex. 17

14   (DEFS 47-48), ECF No. 53-20.  Part of Vargas's appeal process included a hearing in front of

15   Lieutenant Whitman, who was responsible for reviewing the evidence that substantiated the RVR.

16   Whitman Dep. at 53:15-18.

17   A duty of a program lieutenant, such as the post Lieutenant Whitman was assigned to in

18   June 2021, is to serve as a hearing officer tasked with determining whether sufficient evidence

19   exists to find an inmate guilty of charged misconduct that violates prison regulations.  Whitman

20   Decl. ¶ 3.  When serving as a hearing officer, Lieutenant Whitman would ensure the accused

21   inmate understood the charged rules violation, document the inmate's plea, and provide the inmate

22   an opportunity to make a statement in support of his plea.  *Id.*  When the inmate would make his

23   statement, Lieutenant Whitman states he would write it down verbatim.  *Id.*  Vargas disputes this,

24   noting that no documents were produced containing Lieutenant Whitman's verbatim written

25   account of the June 27, 2021 hearing.  After conducting the disciplinary hearing, Lieutenant

26   Whitman was required to find the inmate guilty of the charged rules violation if "a preponderance

27   of the evidence submitted at the hearing substantiates the charge."  Whitman Decl. ¶ 3; Cal. Code

28   Regs. tit. 15, § 3320(l).

United States District Court
Northern District of California

1    On June 27, 2021, Lieutenant Whitman convened a hearing with Vargas to determine if

2    enough evidence existed to find Vargas guilty of the charged participation in the May 25 riot.

3    Whitman Decl. ¶ 5 & Ex. A.  In making this determination, Lieutenant Whitman states he

4    reviewed and considered the May 25 riot incident reports, the medical report of injury

5    documenting Vargas's injures from the riot, and any statement Vargas made during the June 27

6    hearing.  Whitman Decl. ¶ 6.  Vargas disputes this, stating Lieutenant Whitman testified he

7    "skimmed" the incident report package, and that Lieutenant Whitman refused to review the staff

8    reports, which showed that as soon as the E-Wing inmates crossed the threshold from the

9    pedestrian walkway to the yard, the Bulldogs ran towards them and attacked them.  Vargas Dep. at

10   59:18-23; Whitman Dep. at 88:16-22, 111:11-20; 88:16-22; Gallagher Decl. ¶ 14, Ex. 13 (Incident

11   Reports), ECF No. 53-16.

12   The parties have differing views of the incident reports.  Gallagher Decl. ¶ 14, Ex. 13.

13   According to Lieutenant Whitman, the reports stated that inmates being released from E-Wing to

14   the yard and inmates affiliated with the Bulldogs, who were already on the yard, simultaneously

15   ran toward and met each other.  Whitman Decl. ¶ 7.  Lieutenant Whitman also contends the

16   incident reports stated that when the group of E-Wing inmates and the group of Bulldogs met,

17   inmates from both groups began striking each other with clenched fists.  *Id.*  Vargas disputes this,

18   stating the reports show that as soon as the E-Wing inmates crossed the threshold from the

19   pedestrian walkway to the yard, the Bulldogs ran towards them and attacked them.  According to

20   Lieutenant Whitman, the incident reports indicate that Vargas was an inmate involved in the riot.

21   *Id.* ¶ 8.  Lieutenant Whitman also states the incident reports "showed that Vargas did not retreat."

22   *Id.* ¶¶ 10-11.  However, Vargas notes the incident reports do not mention him by name, nor do

23   they otherwise show he did not retreat.  Gallagher Decl., Ex. 13 (DEFS 309-11, 324, 330, 333,

24   360).  During the June 27 hearing, Vargas stated, "We never ran, they were the aggressors."

25   Whitman Decl. ¶ 10 & Ex. B.  Vargas testified that he brought documents to the hearing to present

26   to Lieutenant Whitman, but Lieutenant Whitman "didn't want to see it."  Vargas Dep. at 59:18-23.

27   Lieutenant Whitman concluded that Vargas's injuries documented on the May 25 medical report

28   could only be explained by Vargas having participated in the May 25 riot.  Whitman Decl. ¶ 9.

1    Vargas contends Lieutenant Whitman found him guilty of the conduct outlined in the RVR

2    because he had filed staff complaints against Lopez, Sergeant McDonald, and Lieutenant Marcus

3    for their involvement in the May 25 attack.  Vargas Dep. at 32:5-23.  Across all the RVR hearings

4    he participated in, Whitman found 90% of inmates guilty as charged.  Whitman Dep. at 52:8-15.

5    **D.    Procedural Background**

6        On May 5, 2023, Vargas, representing himself, filed this action, naming Officer Lopez-

7    Ortega and Lieutenant Whitman as defendants.  The Court granted Vargas's application to proceed

8    in forma pauperis (ECF No. 7) and subsequently screened his complaint and ordered service on

9    Defendants (ECF No. 8).  The Court found the complaint states the following cognizable claims:

10   (1) an Eighth Amendment claim under 42 U.S.C. § 1983 against Officer Lopez-Ortega for

11   deliberate indifference to Vargas's safety; (2) a state-law negligence claim against Officer Lopez-

12   Ortega; and (3) a First Amendment retaliation claim under 42 U.S.C. § 1983 against Lieutenant

13   Whitman.  ECF No. 8.

14       On October 13, 2023, Defendants informed the Court that they did not intend to file a

15   summary judgment motion and that they believed that settlement negotiations would be

16   unproductive.  ECF No. 14.  In light of Defendants' filing, the Court referred Vargas to the

17   Federal Pro Bono Project for location of pro bono counsel.  ECF No. 16.  On December 3, 2023,

18   the Court appointed attorneys from Venable LLP to serve as appointed pro bono counsel.  ECF

19   No. 17.  The parties subsequently participated in settlement a settlement conference in July 2024

20   but were unable to settle.  ECF Nos. 32-33.

21       Defendants filed the present motion on December 19, 2024.

22                    **III.    LEGAL STANDARD**

23       Summary judgment is proper where there is "no genuine dispute as to any material fact and

24   the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The party moving

25   for summary judgment bears the initial burden of identifying those portions of the pleadings,

26   discovery and affidavits that demonstrate the absence of a genuine issue of material fact.  *Celotex*

27   *Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Material facts are those that may affect the outcome

28   of the case, and a dispute as to a material fact is genuine if there is sufficient evidence for a

United States District Court
Northern District of California

United States District Court
Northern District of California

reasonable jury to return a verdict for the nonmoving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

If the moving party meets its initial burden, the opposing party must then set forth specific facts showing that there is a genuine issue for trial.  Fed. R. Civ. P. 56(c)(1); *Anderson*, 477 U.S. at 250.  All reasonable inferences must be drawn in the light most favorable to the nonmoving party.  *Olsen v. Idaho State Bd. of Med.*, 363 F.3d 916, 922 (9th Cir. 2004).  However, it is not the task of the Court "'to scour the record in search of a genuine issue of triable fact."  *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996).  The nonmoving party has the burden "to identify with reasonable particularity the evidence that precludes summary judgment."  *Id.*; *Cafasso, U.S. ex rel. v. Gen. Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1061 (9th Cir. 2011) (The nonmoving party "must set forth non-speculative evidence of specific facts, not sweeping conclusory allegations.") (citations omitted).  Thus, "[t]he district court need not examine the entire file for evidence establishing a genuine issue of fact, where the evidence is not set forth in the opposing papers with adequate references so that it could conveniently be found."  *Carmen v. S.F. Unified Sch. Dist.*, 237 F.3d 1026, 1031 (9th Cir. 2001); *Christian Legal Soc. Chapter of Univ. of Cal. v. Wu*, 626 F.3d 483, 488 (9th Cir. 2010) ("Judges are not like pigs, hunting for truffles buried in briefs.") (citations omitted).

"While the evidence presented at the summary judgment stage does not yet need to be in a form that would be admissible at trial, the proponent must set out facts that it will be able to prove through admissible evidence."  *Norse v. City of Santa Cruz*, 629 F.3d 966, 973 (9th Cir. 2010) (citing Fed. R. Civ. P. 56(c) ("An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.")).  If the nonmoving party fails to identify such evidence, or if it offers evidence that is "merely colorable, or is not significantly probative, summary judgment may be granted."  *Anderson,* 477 U.S. at 249–50 (citations omitted).

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

### IV.    DISCUSSION

**A.    42 U.S.C. § 1983**

42 U.S.C. § 1983 makes liable any "person who, under color of any statute, ordinance,

regulation, custom, or usage, of any State . . ., subjects, or causes to be subjected, any . . . person .

. . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws."

"Section 1983 is not itself a source of substantive rights, but merely provides a method for

vindicating federal rights elsewhere conferred." *Albright v. Oliver*, 510 U.S. 266, 271, (1994)

(internal quotation marks omitted).  "To state a claim under § 1983, a plaintiff [1] must allege the

violation of a right secured by the Constitution and laws of the United States, and [2] must show

that the alleged deprivation was committed by a person acting under color of state law." *Naffe v.*

*Frey*, 789 F.3d 1030, 1035–36 (9th Cir. 2015).

**B.    Eighth Amendment – Failure to Protect**

Defendants seek summary judgment in their favor as to Vargas's Eighth Amendment

claim, arguing the undisputed material facts establish that Officer Lopez-Ortega did not know that

permitting Vargas to attend yard posed a serious risk to his safety and, even if Vargas attended

yard only because Officer Lopez-Ortega stated that yard was "mandatory," Vargas concedes that

him attending yard with Bulldogs did not pose a serious threat to his safety.  Mot. at 14-15.

#### 1.    Legal Standard

It is well-established that prison officials have a duty to take reasonable steps to protect

inmates from physical harm.  *See Farmer v. Brennan*, 511 U.S. 825, 832–33 (1994).  In particular,

prison officials have an affirmative duty to protect inmates from violence at the hands of other

inmates.  *Id.* at 833.  The failure of a prison official to protect inmates from attacks by others from

dangerous conditions at the prison violates the Eighth Amendment when two requirements are

met: (1) the deprivation alleged is, objectively, sufficiently serious, and (2) the official is,

subjectively, deliberately indifferent to the inmate's safety.  *Id.* at 834.

In determining whether a deprivation is sufficiently serious to satisfy the objective

component of an Eighth Amendment claim, a court must consider the circumstances, nature, and

duration of the deprivation.  *Id.*  With respect to the subjective component in prison conditions

1    cases, a prison official cannot be held liable under the Eighth Amendment for failing to guarantee

2    the safety of a prisoner unless the standard for criminal recklessness is met, i.e., the official must

3    know of and disregard an excessive risk to the inmate's safety. *Id*. at 837 (holding deliberate

4    indifference requires that "the official knows of and disregards an excessive risk to inmate health

5    or safety; the official must both be aware of facts from which the inference could be drawn that a

6    substantial risk of serious harm exists, and he must also draw the inference").

7         Deliberate indifference lies "somewhere between the poles of negligence at one end and

8    purpose or knowledge at the other." *Id*. at 836. On the one hand, deliberate indifference describes

9    a more blameworthy state of mind than negligence—negligence, and even gross negligence, are

10   not enough to trigger an Eighth Amendment violation. *Id*. at 835. On the other hand, a plaintiff is

11   not required to show purposeful conduct to meet his burden of showing deliberate indifference.

12   *Id*. at 836.

13        **2.    Substantial Risk of Serious Harm**

14        A reasonable factfinder, viewing the facts in the light most favorable to Vargas, could find

15   that he was subjected to an objectively substantial risk of serious harm when he was released into

16   the yard.

17        There is no dispute that allowing certain inmates, including members of the Bulldogs and

18   Sureños gangs, to program together risked the safety of inmates at CTF. Lopez-Ortega Decl. ¶ 2;

19   Galvan Decl. ¶ 3 & Ex. A. There is also no dispute that CDCR documented Vargas's affiliation

20   with the Sureños as early as October 19, 2018. Gallagher Decl., Ex. 10 (DEFS 1). Two years

21   later, on October 20, 2020, a CDCR investigation identified Vargas as an associate of the EME.

22   *Id*. ¶ 2, Ex. 1 (VAR00013). And, on April 20, 2021—one month prior to the prison yard attack—

23   Vargas's request for leave to attend his mother's funeral was denied, based at least in part on the

24   basis that he was a suspected associate of both the Sureños and EME gangs. Gallagher Decl. ¶ 12,

25   Ex. 11 (DEFS 64). Officer Lopez-Ortega testified that his job as a floor officer required him to

26   know whether an inmate is a validated gang member, and he received training on how to verify

27   whether an inmate was a validated gang member. Lopez-Ortega Dep. at 28:2-10 ("Q. You

28   mentioned validated gang members. In your capacity as a floor officer, are you required to know

United States District Court
Northern District of California

13

1    whether or not an inmate in your wing is a validated gang member?  A. Yes.  Q. Are you trained

2    on or explained how to know whether an inmate is a validated gang member or security threat

3    group, STG?  A. Yes.").  Officer Lopez-Ortega also testified he knew that E-Wing and Z-Wing

4    inmates were to be kept separate because there was a potential for inmates from the two wings to

5    fight.  *Id.* at 46:11-15 ("A. STGs wouldn't go to the yard on those specific days with the Zebra

6    Wing.  Q. Can you explain why?  A. Because there . . . would be potential fights.").

7        Officer Lopez-Ortega testified that he knew placing inmates in the yard with Bulldogs

8    risked their safety.  *See* Lopez-Ortega Dep. at 36:18-37:1) ("Every time the Bulldogs would come

9    out, they would just fight.  If they were not Bulldogs, they would fight with other people.").  Thus,

10   on May 25, 2021, when Officer Lopez-Ortega released inmates into the yard where there were

11   Bulldogs, there can be no dispute that the Bulldogs posed a threat.

12       Officer Lopez-Ortega argues he could not have disregarded Vargas's safety because

13   Vargas admitted he could safely program with Bulldogs.  Mot. at 15.  He points to Vargas's

14   January 2020 interview as proof Vargas "waived" his rights.  *Id.*  But the interview, viewed in the

15   light most favorable to Vargas, does not establish a waiver.  The form notes that Vargas refused to

16   sign it.  Galvan Decl., Ex. A.  When asked about the form at his September 25, 2023 deposition,

17   Vargas conceded that in January 2020, he probably could have programmed safely with the

18   Bulldogs.  Vargas Dep. at 50:14–16.  However, the relevant incident occurred on May 25, 2021—

19   nearly eighteen months after that interview.  In between, the record shows that on October 20,

20   2020, a CDCR investigation found "sufficient evidence" to identify Vargas as an associate of the

21   Mexican Mafia (EME) gang (Gallagher Decl., Ex. 1) and on April 20, 2021, Vargas's request for

22   Temporary Community Leave to attend his mother's funeral was denied, at least in part because

23   he had a suspected affiliation with STG 1 Sureños and STG 2 EME (*id.*, Ex. 11).

24       In sum, drawing all reasonable inferences in Vargas's favor, the Court finds he has set

25   forth specific facts showing there is a genuine issue for trial as to whether prison officials were

26   aware he could not safely program with the Bulldogs.  Based on this record, Vargas has

27   established a triable issue of fact as to whether the decision to release him into the yard created an

28   objectively substantial risk of harm.  *See Manzanillo v. Lewis*, 267 F. Supp. 3d 1261, 1272 (N.D.

United States District Court
Northern District of California

14

Cal. 2017) (denying summary judgment as to Eighth Amendment claim where evidence showed inmate-on-inmate violence occurred at the prison, that inadvertent or intentional door openings may lead to such violence, that policies were in place to prevent such violence, and the defendant "acknowledged in his deposition that in the SHU, 'due to the assaultive nature of the inmates housed there . . . the different gang rivalries and the politics within the different prison gangs when you let two inmates out unrestrained generally there was going to be a fight.'"); *Sims v. Diaz*, 2021 WL 1110267, at *9 (N.D. Cal. Mar. 23, 2021) ("The specific threat of attack from a prison gang suffices to show an objectively sufficiently serious condition for Eighth Amendment purposes.").

### 3.    Deliberate Indifference

Viewing the evidence in the light most favorable to Vargas, the Court also concludes that genuine disputes of material fact exist as to whether Officer Lopez-Ortega knew of the substantial risk and disregarded it.

"Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence." *Farmer*, 511 U.S. at 842. "[A] factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Id.*; *see also Berg v. Kincheloe*, 794 F.2d 457, 459 (9th Cir. 1986) (holding that the prison official need not "believe to a moral certainty that one inmate intends to attack another at a given place at a time certain before that officer is obligated to take steps to prevent such an assault."). The "obviousness of a risk," however, is not conclusive, and "a prison official may demonstrate that the obvious escaped him." *Farmer*, 511 U.S. at 843 n.8. "'If a [prison official] should have been aware of the risk, but was not, then the [official] has not violated the Eighth Amendment, no matter how severe the risk.'" *Toguchi v. Chung*, 391 F.3d 1051, 1057 (9th Cir. 2004) (alterations in original) (quoting *Gibson v. Cnty. of Washoe, Nev.*, 290 F.3d 1175, 1188 (9th Cir. 2002)).

Officer Lopez-Ortega testified that, although he interacted with Vargas at least sometimes on a daily basis, he did not know Vargas was STG. Lopez-Ortega Dep. at 52:23-53:5. He states that at the beginning of his shifts, his supervisors regularly provided him an updated list of the certain inmates in the Sureños group and the Bulldogs group that were not permitted to program

United States District Court
Northern District of California

1  together, and that if an inmate in E-Wing was not identified on the list of inmates, there was

2  nothing unique to that inmate to indicate that he could not safely attend yard with all general

3  population inmates, which included inmates on the Bulldogs list.  Lopez-Ortega Decl. ¶ 3.  Officer

4  Lopez-Ortega also states he confirmed Vargas was not on the list of inmates who were not

5  permitted to attend yard with Bulldogs.  *Id.* ¶ 6.  Officer Lopez-Ortega therefore maintains he was

6  not aware of any specific risk to Vargas's safety, and he therefore did not disregard any such risk.

7         Viewing the facts in the light most favorable to Vargas, however, a reasonable jury could

8  conclude that Officer Lopez-Ortega was deliberately indifferent to the risk of attack on Vargas.

9  Officer Lopez-Ortega states he understood that, per CTF's modified program, in May 2021,

10  certain inmates affiliated with the Sureños, including some other STGs, were placed in one

11  programming group, and certain inmates affiliated with the Bulldogs were placed in a different

12  programming group.  Lopez-Ortega Decl. ¶ 2.  He understood that interactions between certain

13  inmates who were documented as being affiliated with the Sureños and certain inmates who were

14  documented as being affiliated with the Bulldogs were restricted, including restrictions prohibiting

15  certain affiliates of the two STGs from programming together on the yard.  *Id.*  While he testified

16  that he did not know that Vargas was STG, Vargas has presented evidence that Officer Lopez-

17  Ortega's job as a floor officer required him to know whether an inmate is a validated gang

18  member, and that Officer Lopez-Ortega received training on how to verify whether an inmate was

19  a validated gang member.  Lopez-Ortega Dep. at 28:2-10.  Vargas also states he told Officer

20  Lopez-Ortega he could not safely program with the Bulldogs because he was a suspected member

21  of two gangs: the EME and Sureños.  Vargas Decl. ¶¶ 4-5.  As to the updated inmate list Officer

22  Lopez-Ortega states he received at the beginning of his shifts, when asked in his deposition if he

23  would "receive [a list] daily or was it something that you had on hand," Officer Lopez-Ortega

24  testified "we had on hand."  When asked if he knew "how often the list was updated," Lopez

25  testified "No."  Lopez-Ortega Dep. at 48:15-19.  Vargas also presents evidence that Officer

26  Lopez-Ortega told him it was "go time," that the Bulldogs were waiting for him and he should "go

27  handle [his] business," and that it was "mandatory yard and the gurneys are waiting for you."

28  Vargas Decl. ¶¶ 2-6; Vargas Dep. at 20:18-21:8; Dicey Dep. at 41:6-15, 42:19-43:2.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

Notably, the Ninth Circuit has reversed a grant of summary judgment in similar circumstances.  In *Delgado v. Barnes*, 465 Fed. App'x 712 (9th Cir. 2012), the defendant argued to the district court that his release of the prisoners who attacked the plaintiff was "inadvertent." *Delgado v. Barnes*, 2010 WL 3744367, at *3 (N.D. Cal. Sep. 20, 2010).  The plaintiff argued that the defendant's "actions were done on purpose."  *Id*.  The district court held that "[p]laintiff's statements [went] only to his beliefs, not what [the defendant] believed or what his intent was," and therefore plaintiff could not "generate a genuine issue of material fact as to whether the release was inadvertent."  *Id*. (citing *Rodriguez v. Airborne Express*, 265 F.3d 890, 902 (9th Cir. 2001)).  Since "the only fact that might generate a genuine issue as to [the defendant's] intent, that he opened the inmates' cell doors at the wrong time, [was] equally probative of intent or inadvertence," the district court granted summary judgment.  *Id*.  The Ninth Circuit reversed, noting that even in a sparse "he said, she said" situation, summary judgment is "premature" where "a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious."  *Delgado*, 465 Fed. App'x at 712 (quoting *Farmer*, 511 U.S. at 842).

Here, the same type of situation exists, with Vargas presenting one set of facts and Officer Lopez-Ortega presenting another.  As such, the Court finds Officer Lopez-Ortega is not entitled to summary judgment on Vargas's Eighth Amendment claim.  *Id*.; *see also Manzanillo*, 267 F. Supp. 3d at 1273-74 (denying summary judgment where defendant claimed no prior knowledge of plaintiff's gang affiliations, but plaintiff presented contradictory evidence); *Robinson v. Prunty*, 249 F.3d 862, 865-67 (9th Cir. 2001) (affirming denial of summary judgment where prison officials placed an African–American prisoner in an integrated exercise yard where frequent attacks had taken place, made jokes about the possibility of attacks, and failed to intervene quickly when an attack occurred, finding such evidence "raised a genuine issue of material fact concerning whether [the plaintiff] was imprisoned under conditions posing a substantial risk of serious harm and whether prison officials both knew of and disregarded an excessive risk to [his] health or safety."); *Lyons v. Baughman*, 124 F. App'x 549, 550 (9th Cir. 2005) (affirming denial of summary judgment on Eighth Amendment claim involving failure to protect inmates from violence by other inmates because "[t]he facts alleged in this case establish that Baughman knew

17

1    that Lyons faced a serious risk that members of Lyons' gang would harm him after he, at

2    Baughman's direction, wrongly assured the gang members that they would not be assaulted.").

3        **4.    Qualified Immunity**

4        Defendants also argue summary judgment is warranted as to Vargas's Eighth Amendment

5    claim because Officer Lopez-Ortega is entitled to qualified immunity.  The defense of qualified

6    immunity protects "government officials . . . from liability for civil damages insofar as their

7    conduct does not violate clearly established statutory or constitutional rights of which a reasonable

8    person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  A court considering

9    a claim of qualified immunity must determine whether the plaintiff has alleged the deprivation of

10   an actual constitutional right and whether such right was "clearly established." *Pearson v.*

11   *Callahan*, 555 U.S. 223, 236 (2009).  Where there is no clearly established law that certain

12   conduct constitutes a constitutional violation, a defendant cannot be on notice that such conduct is

13   unlawful. *Rodis v. City & Cnty. of San Francisco*, 558 F.3d 964, 970–71 (9th Cir. 2009).  The

14   relevant, dispositive inquiry in determining whether a right is clearly established is whether it

15   would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.

16   *Saucier v. Katz*, 533 U.S. 194, 202 (2001).

17       The Court has already determined that a jury could conclude that Defendants violated the

18   Eighth Amendment.  Therefore, the Court now considers whether the right at issue was "clearly

19   established" at the time of the violation.  In a § 1983 action, the plaintiff "bears the burden of

20   proving that the right allegedly violated was clearly established at the time of the official's

21   allegedly impermissible conduct." *Camarillo v. McCarthy*, 998 F.2d 638, 640 (9th Cir. 1993).  To

22   qualify as a clearly established constitutional right, a plaintiff must show "that every reasonable

23   official would [have understood] that what he is doing violates that right." *Reichle v. Howards*,

24   566 U.S. 658, 664 (2012) (citation and internal quotation marks omitted).  In other words,

25   "existing precedent must have placed the statutory or constitutional question beyond debate." *Id.*

26   (citation and internal quotation marks omitted).

27       Defendants argue "[i]t was not clearly established that Officer Lopez-Ortega violated

28   Vargas's rights when Officer Lopez-Ortega permitted Vargas to attend yard with Bulldogs after

United States District Court
Northern District of California

18

Vargas affirmatively informed prison officials that he could safely program alongside Bulldogs, Officer Lopez-Ortega confirmed that Vargas was not on the list of inmates who could not program with Bulldogs consistent with instructions from his superior officers, and Vargas chose to participate in and not retreat from the ensuing riot involving Vargas and his fellow E-Wing inmates." Mot. at 20. However, Defendants' argument is based on disputed facts that are specific to this case. By May 2021 "it was clearly established in the Ninth Circuit that prison officials violate inmates' constitutional rights when the officials are aware 'that placing inmates of different races [or gangs] in [the same place] at the same time presents a serious risk of violent outbreaks,' yet allow them to be in the same place together anyway." *Manzanillo*, 267 F. Supp. 3d at 1274 (alterations in original) (quoting *Robinson*, 249 F.3d at 867).

As to whether Officer Lopez-Ortega's actions were reasonable, this is a mixed question of law and fact: "It involves an objective test of whether a reasonable official could have believed that his conduct was lawful in light of what he knew and the action he took. If there are genuine issues of material fact in issue relating to the historical facts of what the official knew or what he did, it is clear that these are questions of fact for the jury to determine." *Williams v. Williams*, 2012 WL 1094351, at *11 (N.D. Cal. Mar. 29, 2012) (quoting *Sinaloa Lake Owners Ass'n v. City of Simi Valley*, 70 F.3d 1095, 1099 (9th Cir. 1995)). Here, the Court finds that, as in *Williams*, "[w]hen the facts underlying Plaintiff's deliberate indifference to safety . . . claim[ ] [is] viewed in the light most favorable to him, a genuine issue of material fact exists as to the reasonableness of [Officer Lopez-Ortega] letting [Vargas] out . . . in light of [his] knowledge that it was a violation of prison policy to do so." *Id.* A jury could conclude that no reasonable officer knowing what Officer Lopez-Ortega knew—that the CTF housed dangerous inmates who were not to be in the same place at the same time, that prisoners of differing gangs would fight each other if they could, and that policies in place required monitoring while they moved about—would have purposefully violated those policies by releasing Vargas into the yard, creating a substantial risk of inmates being together in the same place unrestrained. *See Manzanillo*, 267 F. Supp. 3d at 1274 (denying motion for summary judgment on qualified immunity grounds based on similar facts).

Accordingly, Defendants' motion for summary judgment as to Vargas's Eighth

1  Amendment claim on grounds of qualified immunity must be denied.

2  **C.      Negligence**

3          To prove a negligence cause of action, a plaintiff must prove that (1) a defendant owed

4  them a duty, (2) a defendant breached that duty, and (3) the breach proximately caused their

5  injuries.  *John B. v. Superior Court*, 38 Cal. 4th 1177, 1188 (2006).  Defendants argue the

6  undisputed material facts establish that Officer Lopez-Ortega reasonably acted to protect Vargas

7  from foreseeable harm when releasing Vargas to attend yard on May 25.  Mot. at 16.  As such,

8  they argue Vargas cannot show Officer Lopez-Ortega breached his duty of care or that he was the

9  proximate cause of Vargas's injuries.  *Id.*

10         **1.      Duty of Care**

11         Defendants do not dispute that Officer Lopez-Ortega had a duty to protect Vargas.

12 California law is clear that there exists a special relationship between a jailer and a prisoner giving

13 rise to a duty of care to protect the prisoner from foreseeable harm inflicted by a third party.  *See,*

14 *e.g., Giraldo v. Dept. of Corrs. & Rehab.*, 168 Cal. App. 4th 231, 250 (2008) ("important factors

15 in determining whether a relationship is 'special' include vulnerability and dependence.  Prisoners

16 are vulnerable.  And dependent.  Moreover, the relationship between them is protective by nature,

17 such that the jailer has control over the prisoner, who is deprived of the normal opportunity to

18 protect himself from harm inflicted by others.").

19         **2.      Breach**

20         It is a "long-established principle of California negligence law that the reasonableness of a

21 peace officer's conduct must be determined in light of the totality of the circumstances."  *Hayes v.*

22 *Cnty. of San Diego*, 57 Cal. 4th 622, 632 (2013) (affirming summary judgment for police officer

23 while noting the discretion afforded to law enforcement when addressing a situation).

24 Considering the circumstances here, there is a genuine issue of material fact as to whether Officer

25 Lopez-Ortega breached his duty.  Viewing the facts in the light most favorable to Vargas, a

26 reasonable jury could find Officer Lopez-Ortega breached his duty to Vargas if he (1) failed to

27 know Vargas was STG, despite stating he was required to know whether an inmate in his wing

28 was a validated gang member, (2) refused to listen to Vargas when he explained that he could not

United States District Court
Northern District of California

20

1  safely program with the Bulldogs, and (3) released Vargas to go into the yard despite knowing that

2  Bulldogs were waiting there.

3      **3.    Proximate Cause**

4      The proximate cause inquiry asks whether it was foreseeable that Officer Lopez-Ortega's

5  breach of his duty would lead to Vargas's injury.  "Foreseeability is determined in light of all the

6  circumstances and does not require prior identical events or injuries."  *J.H. v. Los Angeles Unified*

7  *Sch. Dist.*, 183 Cal. App. 4th 123, 146 (2010).  Defendants argue Officer Lopez-Ortega could not

8  have foreseen that "Vargas would have chosen to enter the area where the riot occurred and then

9  sustained injuries that were the natural consequence of Vargas's choice."  Mot. at 17.  However, as

10  discussed above, Vargas has presented evidence that Officer Lopez-Ortega knew that forcing

11  Vargas to attend yard against his will would result in Vargas's assault, yet Officer Lopez-Ortega

12  told Vargas it was "mandatory" to attend yard.  Defendants further argue that "[e]ven though he

13  saw the Bulldogs moving towards him and his fellow E-Wing inmates as they walked to the yard,

14  Vargas nevertheless failed to retreat from the Bulldogs or the riot."  *Id.*  But Vargas has presented

15  evidence that there was nowhere to go "because they closed the gate," and, although at least two

16  other officers were on the yard at the time, "[t]hey couldn't do nothing."  Vargas Dep. at 22:8-10.

17  As such, Vargas has presented evidence sufficient to raise issues of material fact as to his

18  negligence claim.  Accordingly, Defendants' motion for summary judgment as to this claim must

19  be denied.

20  **D.    First Amendment - Retaliation**

21      Defendants seek summary judgment in their favor as to Vargas's First Amendment

22  retaliation claim, arguing participating in a riot is not protected conduct, Lieutenant Whitman did

23  not find Vargas guilty of participating in a riot because of Vargas's claimed protected conduct, and

24  finding Vargas guilty of participating in a riot furthered a legitimate correctional goal.  Mot. at 9.

25      **1.    Legal Standard**

26      "Prisoners have a First Amendment right to file grievances against prison officials and to

27  be free from retaliation for doing so."  *Watison v. Carter*, 668 F.3d 1108, 1114 (9th Cir. 2012).

28  "Within the prison context, a viable claim of First Amendment retaliation entails five basic

*United States District Court*
*Northern District of California*

21

elements: (1) An assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal." *Rhodes v. Robinson*, 408 F.3d 559, 567-68 (9th Cir. 2005) (footnote omitted); *accord Pratt v. Rowland*, 65 F.3d 802, 806 (9th Cir. 1995) (prisoner suing prison officials under § 1983 for retaliation must allege that he was retaliated against for exercising his constitutional rights and that the retaliatory action did not advance legitimate penological goals, such as preserving institutional order and discipline). Evidence probative of retaliatory motive includes proximity in time between the protected speech and the alleged adverse action, the prison official's expressed opposition to the speech, and the prison official's proffered reason for the adverse action was false or pretextual. *Shepard v. Quillen*, 840 F.3d 686, 689-91 (9th Cir. 2016). Retaliatory motive may also be shown by inconsistency with previous actions, as well as direct evidence. *Bruce v. Ylst*, 351 F.3d 1283, 1288-89 (9th Cir. 2003).

> **2.    Whether Whitman Took an Adverse Action Against Vargas**

The adverse action in the first element of a retaliation claim need not independently deprive the plaintiff (prisoner or not) of a constitutional right. *See, e.g., Vignolo v. Miller*, 120 F.3d 1075, 1078 (9th Cir. 1997) (discharge from prison job for refusal to waive constitutional right states retaliation claim despite no constitutional right to prison job); *Franco v. Kelly*, 854 F.2d 584, 585-86 (2d. Cir. 1988) (false disciplinary charges filed against prisoner for cooperating with state investigation states retaliation claim despite no right to be free from false charges). Harm that "would chill a 'person of ordinary firmness' from complaining" is sufficient. *Shepard*, 840 F.3d at 691 (quoting *Rhodes*, 408 F.3d at 569) (placement in administrative segregation or even threat do so on its own amounts to adverse action satisfying the first element). Here, Defendants do not dispute that Lieutenant Whitman took an adverse action against Vargas, nor can they, as Lieutenant Whitman admits he "found Vargas guilty of the rules violation report that Sergeant Glaze issued charging Vargas with participating in a riot." Whitman Decl. ¶ 6 & Ex. B.

### 3. Whether Filing Staff Complaints was a Factor in Whitman's Decision

Second, to prevail on his retaliation claim, Vargas must show that his protected conduct was "the 'substantial' or 'motivating' factor in the defendant's decision." *Soranno's Gasco, Inc. v. Morgan*, 874 F.2d 1310, 1314 (9th Cir. 1989). Vargas claims Lieutenant Whitman found him guilty of the conduct outlined in the RVR because he filed staff complaints against correctional officers for their involvement in the May 25, 2021 yard incident. Vargas Dep. at 32:5-23. A reasonable jury could find that the proximity between the yard incident, Vargas's grievances, and Lieutenant Whitman's decision provide additional evidence of his retaliatory intent. *See Pratt*, 65 F.3d at 808 ("[T]iming can properly be considered circumstantial evidence of retaliatory intent."); *Amezquita v. Garcia-Cortez*, 2024 WL 3302069, at *10 (N.D. Cal. July 3, 2024) ("Although Defendants assert that the mere fact that one incident followed another is not sufficient to establish a nexus, the evidence must be viewed in the light most favorable to Plaintiff as well as the inferences drawn therefrom. Here, the inference from this close sequence of events is that Defendant Meredith removed Plaintiff from the IAC because he filed a grievance against Defendant Garcia.") (citation omitted). Thus, viewing the evidence in the light most favorable to him, the Court finds Vargas has presented a genuine issue of material fact as to Lieutenant Whitman's intent. *See Brodheim v. Cry*, 584 F.3d 1262, 1267 (9th Cir. 2009) (To survive summary judgment, the prisoner "need only put forth evidence of retaliatory motive, that, taken in the light most favorable to him, presents a genuine issue of material fact as to [the defendant's] intent.") (internal quotation and citation omitted)).

### 4. Whether Filing a Staff Complaint is Protected Conduct

Next, Vargas must allege that the retaliated-against conduct is protected. *Watison*, 668 F.3d at 1114. There can be no dispute that an inmate's right to file a staff complaint is protected. *See, e.g., Rhodes*, 408 F.3d at 567 ("Of fundamental import to prisoners are their First Amendment 'right[s] to file prison grievances'"); *Brodheim*, 584 F.3d at 1271 n.4 (actions taken pursuant to a prison grievance process are protected activities); *Watison*, 668 F.3d at 1114 ("The filing of an inmate grievance is protected conduct.").

Defendants argue Vargas's claim fails because he narrowed the basis of his retaliation

23

claim through his interrogatory responses. Mot. at 9-10. In his complaint, Vargas alleges Lieutenant Whitman found him guilty of participating in a riot because Vargas submitted a grievance and because Lieutenant Whitman wanted to absolve CTF officials from liability for staging the May 25 riot. Compl. at 9. Based on his interrogatory responses, Defendants contend Vargas now "only alleges that the reason Lieutenant Whitman retaliated against him was because Lieutenant Whitman wanted to 'protect the Correctional Training Facility staff and absolve them from any liability for the May 25, 2021 incident.'" Mot. at 10 (quoting Georgely Decl., Ex. B (Pl.'s Resp. Def. Whitman's Interrog. No. 5), ECF No. 46-3). Defendants argue that "such an allegation does not raise any activity by Vargas that the First Amendment protects, such as filing a civil rights lawsuit," and that "Vargas no longer alleges that he filed a grievance or lawsuit prior to Whitman finding him guilty." *Id* at 9. They argue Vargas cannot maintain a claim against Lieutenant Whitman based on this narrowed allegation because "[a]n act by prison officials to cover up malfeasance by other officials is not protected activity that supports a First Amendment retaliation claim." *Id.* (citing *Cruz v. Ford*, 2020 U.S. Dist. LEXIS 1549, at *4 (N.D. Cal. Jan. 6, 2020) ("Taking adverse action in an attempt to cover up misconduct does not state a cognizable First Amendment retaliation claim."); *Wright v. Deforest*, 2024 WL 2786690, at *3 (E.D. Cal. May 30, 2024) (harassing plaintiff and covering up for other defendants is not protected activity for purposes of a retaliation claim)). However, this argument is without merit, as the record shows Vargas has not limited his claim.

Lieutenant Whitman's Interrogatory No. 5 asked: "For all damages you allege that you sustained as the result of Defendant Whitman's alleged actions in this action, explain the factual basis as to why you contend you are entitled to those damages." Georgely Decl., Ex. B (Pl.'s Resp. Def. Whitman's Interrog. No. 5). In response, Vargas stated: "Because Plaintiff was incorrectly placed in the Yard and suffered significant injuries as a result, Plaintiff filed a prison grievance against various Correctional Training Facility officers on June 9, 2021," after which "Defendant Whitman told Plaintiff that he was 'guilty as charged' for the rules violation report because Defendant Whitman had to protect the Correctional Training Staff and absolve them from any liability for the May 25, 2021 incident." *Id.* It is unclear how Defendants read this answer

24

and concluded that "Vargas no longer alleges that he filed a grievance or lawsuit prior to Whitman finding him guilty," but the Court finds no indication in his response that Vargas narrowed the basis of his retaliation claim. Rather, Vargas claims that Lieutenant Whitman retaliated against him because he "filed a prison grievance against various Correctional Training Facility officers." As such, the Court finds Vargas engaged in protected conduct that is expressly protected by the First Amendment.

### 5. Whether Whitman's Actions Chilled Vargas's Exercise of His First Amendment Rights

The fourth element is whether Lieutenant Whitman's alleged retaliation harmed Vargas, including by chilling speech. "An objective standard governs the chilling inquiry; a plaintiff does not have to show that 'his speech was actually inhibited or suppressed,' but rather that the adverse action at issue 'would chill or silence a person of ordinary firmness from future First Amendment activities.'" *Brodheim*, 584 F.3d at 1271 (citing *Rhodes*, 408 F.3d at 568-69). "[A] plaintiff who fails to allege a chilling effect may still state a claim if he alleges he suffered some other harm that is 'more than minimal." *Watison*, 668 F.3d at 1114 (citing *Brodheim*, 584 F.3d at 1269 and *Rhodes*, 408 F.3d at 568 n.11).

Viewing the evidence in the light most favorable to Vargas, a reasonable jury could find he was harmed by Lieutenant Whitman's actions. Vargas states he "no longer feels safe or comfortable reporting any issues within the Correctional Training Facility for fear of being retaliated against or issued a false rules violation report," that he "still experiences PTSD and other ramifications," and he "suffered a 61-day credit penalty due to the fraudulent guilty finding made by Defendant Whitman, and may not be able to reclaim that credit despite not participating in a riot on May 25, 2021." Gallagher Decl. ¶ 24, Ex. 23 (Pl.'s Resp. to Whitman's Interrog. 1), ECF No. 53-26. As such, Vargas raises a triable issue of fact as to the fourth element.

### 6. Legitimate Correctional Goal

Finally, Vargas "bears the burden of pleading and proving the absence of legitimate correctional goals for the conduct of which he complains." *Pratt*, 65 F.3d at 806. A plaintiff successfully pleads this element by alleging, in addition to a retaliatory motive, that the

United States District Court
Northern District of California

1    defendant's actions were arbitrary and capricious, or that they were "unnecessary to the

2    maintenance of order in the institution." *Franklin v. Murphy*, 745 F.2d 1221, 1230 (9th Cir.

3    1984); *Rizzo v. Dawson*, 778 F.2d 527, 532 (9th Cir. 1985).

4         Defendants argue Lieutenant Whitman's guilty finding served a legitimate correctional

5    goal because "[t]he state has a legitimate interest in maintaining institutional order, safety, and

6    security in its prisons." Mot. at 11 (citing *Rizzo*, 778 F.2d at 532; *Watison*, 668 F.3d at 1114–15).

7    They argue the undisputed material facts show Lieutenant Whitman found Vargas guilty because

8    the evidence available to him showed that Vargas participated in a riot. *Id.* Defendants note

9    Lieutenant Whitman relied on reports from responding officers, "which establish that Vargas was

10   an inmate who was involved in the riot," and that when the riot ended, "several officers identified

11   Vargas as an inmate located in the immediate area where the riot occurred." *Id.* at 12. As such,

12   "because Vargas violated prison regulations, Lieutenant Whitman had an obligation to find Vargas

13   guilty." *Id.* at 13.

14        It is true "that prisons have a legitimate penological interest in stopping prison gang

15   activity." *Bruce*, 351 F.3d at 1289 (citing *Bell v. Wolfish*, 441 U.S. 520 (1979)). However, the

16   Ninth Circuit has cautioned that "prison officials may not defeat a retaliation claim on summary

17   judgment simply by articulating a general justification for a neutral process, when there is a

18   genuine issue of material fact as to whether the action was taken in retaliation for the exercise of a

19   constitutional right." *Id.* Here, viewing the facts in the light most favorable to Vargas, the Court

20   finds there is evidence in the record from which retaliatory animus can be inferred.

21        There is no dispute that Vargas filed staff complaints against correctional officers for their

22   involvement in the May 25, 2021 yard incident. If Lieutenant Whitman used a legitimate hearing

23   process to punish Vargas for his complaints, the use of this process was not a reasonable

24   advancement of a legitimate penological goal. *See Johnson v. Ryan*, 55 F.4th 1167, 1202 (9th Cir.

25   2022) ("[I]f Belt and Montano used procedures outlined in ADC's policies to remove Johnson

26   from the SDP and transfer him back to the Browning Unit in order to punish Johnson for his

27   lawsuits, their use of these procedures was pretextual and not a reasonable advancement of the

28   legitimate penological goal of stopping prison gang activity.").

1     As to the hearing process itself, Vargas raises several issues.  Lieutenant Whitman states

2  he would provide the inmate an opportunity to make a statement in support of his plea and, when

3  the inmate would make his statement, he would write it down verbatim.  Whitman Decl. ¶ 3.

4  Vargas disputes this, noting that no documents were produced containing Lieutenant Whitman's

5  verbatim written account of the June 27, 2021 hearing.  Lieutenant Whitman states he reviewed

6  and considered the May 25 riot incident reports, the medical report of injury documenting

7  Vargas's injures from the riot, and the statement Vargas made during the June 27 hearing.  *Id.* ¶ 6.

8  Vargas disputes this, stating Lieutenant Whitman testified he "skimmed" the incident report

9  package, and that Lieutenant Whitman refused to review documents he brought to the hearing,

10  which Vargas claims showed that as soon as the E-Wing inmates crossed the threshold from the

11  pedestrian walkway to the yard, the Bulldogs ran towards them and attacked them.  Vargas Dep. at

12  59:18-23; Whitman Dep. at 88:16-22, 111:11-20; 88:16-22; Gallagher Decl. ¶ 14, Ex. 13.

13     The parties also have differing views of the incident reports.  According to Lieutenant

14  Whitman, the reports show that inmates being released from E-Wing to the yard and inmates

15  affiliated with the Bulldogs, who were already on the yard, simultaneously ran toward and met

16  each other.  Whitman Decl. ¶ 7.  Lieutenant Whitman also contends the reports state that when the

17  group of E-Wing inmates and the group of Bulldogs met, involved inmates from both groups

18  began striking each other with clenched fists.  *Id.*  Vargas disputes this, stating the reports show

19  that as soon as the E-Wing inmates crossed the threshold from the pedestrian walkway to the yard,

20  the Bulldogs ran towards them and attacked them.  During the June 27 hearing, Vargas stated,

21  "We never ran, they were the aggressors."  Whitman Decl. ¶ 10 & Ex. B.  Lieutenant Whitman

22  notes the reports "showed that Vargas did not retreat."  Whitman Decl. ¶¶ 10-11.  However,

23  Vargas notes the reports do not mention him by name, nor do they otherwise show he did not

24  retreat.  Gallagher Decl., Ex. 13 (DEFS 309-11, 324, 330, 333, 360).

25     In sum, while CTR's hearing process may serve a legitimate correctional goal, viewing the

26  record in the light most favorable to Vargas shows there are genuine issues of material fact as to

27  whether the hearing outcome in this case was retaliatory.  *See Mt. Healthy City Sch. Dist. Bd. of*

28  *Educ. v. Doyle*, 429 U.S. 274, 283-84 (1977) (if a state actor takes action against an individual in

retaliation for that individual exercising a constitutional right, the individual has a cognizable First Amendment retaliation claim under 42 U.S.C. § 1983, even if the action would not be unconstitutional in the absence of retaliatory motive); *Quiroz v. Horel*, 85 F. Supp. 3d 1115, 1143 (N.D. Cal. 2015) ("Here, because there is a genuine issue of material fact as to retaliatory motive, defendants cannot rely on the prison's legitimate penological interest in prison security to succeed on their motion for summary judgment."); *Quiroz v. Short*, 85 F. Supp. 3d 1092, 1107 (N.D. Cal. 2015) (same); *Kilgore v. Clavijo*, 2024 WL 2818858, at *24 (N.D. Cal. June 3, 2024) ("The fact that cell searches can serve legitimate penological objectives does not mean that cell searches are never retaliatory, especially where there is significant evidence supporting a finding of retaliatory intent.").

Accordingly, the Court finds Vargas has established triable issues of material fact as to his First Amendment retaliation claim.

### 7.    Qualified Immunity

Defendants also argue Lieutenant Whitman is entitled to qualified immunity. The Court has already determined that a jury could conclude that Lieutenant Whitman's conduct violated the First Amendment. Therefore, the Court now considers whether the right at issue was "clearly established" at the time of the violation.

Defendants argue

> it was not clearly established that Lieutenant Whitman's conduct violated Vargas's First Amendment rights. It was not clearly established at the time that Lieutenant Whitman finding Vargas guilty of participating in a riot when incident reports, medical reports documenting Vargas's injuries, and Vargas's own statements during the disciplinary hearing established, by a preponderance of the evidence, that Vargas participated in a riot when responding officers identified Vargas as an inmate involved in the riot, sustained injuries consistent with being involved in a riot, and provided no evidence to support a finding that he attempted to retreat from the location of the riot.

Mot. at 19-20. However, "the prohibition against retaliatory punishment is 'clearly established law' in the Ninth Circuit, for qualified immunity purposes." *Pratt*, 65 F.3d at 806 & n.4; *see also Brodheim*, 584 F.3d at 1269 ("Retaliation against prisoners for their exercise of [the First

Amendment right to file prison grievances] is itself a constitutional violation, and prohibited as a matter of 'clearly established law.'") (citing *Rhodes*, 408 F.3d at 566). Thus, qualified immunity cannot protect Lieutenant Whitman if his hearing decision was in retaliation for Vargas's exercise of his First Amendment rights

As to whether Lieutenant Whitman's actions were reasonable, "[i]f there are genuine issues of material fact in issue relating to the historical facts of what the official knew or what he did, it is clear that these are questions of fact for the jury to determine." *Williams*, 2012 WL 1094351, at *11 (quoting *Sinaloa Lake Owners Ass'n*, 70 F.3d at 1099). Viewing the evidence in the light most favorable to Vargas, it would have been clear to Lieutenant Whitman that finding Vargas guilty in retaliation for his protected conduct would violate the law. *See Quiroz*, 85 F. Supp. 3d at 1107 ("Viewing the evidence in the light most favorable to plaintiff, defendant is not entitled to qualified immunity. Here, it would have been clear to defendant that issuing an RVR in retaliation for plaintiff's protected conduct would violate the law."). As such, Defendants' motion for summary judgment as to Vargas's First Amendment claim on grounds of qualified immunity must be denied.

## V.    CONCLUSION

Based on the analysis above, the Court **DENIES** Defendants' motion for summary judgment. The Court shall conduct a case management conference on April 24, 2025, 2025 at 10:00 a.m. by Zoom video conference. The webinar link and instructions are located at https://cand.uscourts.gov/judges/hixson-thomas-s-tsh/. The parties shall file an updated joint case management statement by April 17, 2025.

**IT IS SO ORDERED.**

Dated: February 28, 2025

THOMAS S. HIXSON
United States Magistrate Judge